Don THOMAS, District Judge, Fifty–Eighth Judicial District, Appellant,

v.

JUDICIAL CONDUCT COMMISSION, Appellee.

No. 2002–SC–0035–RR.

Supreme Court of Kentucky.

June 13, 2002.

Peter L. Ostermiller, Louisville, KY, for appellant.

Mindy Barfield, Dinsmore & Shohl, LLP, Lexington, KY, George F. Rabe, Lexington, KY, James D. Lawson, Executive Secretary, Judicial Conduct Commission, Lexington, KY, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a decision of the Judicial Conduct Commission which held that Judge Don Thomas of the Marshall District Court, Benton, Kentucky, had violated four charges of the eight-count charge against him. The Commission imposed a 180–day suspension.

Judge Thomas is a district judge for the Fifty–Eighth Judicial District which consists of Marshall County. The Judicial Conduct Commission authorized an investigation into complaints regarding the conduct of the judge and he was invited to appear before an informal conference. After two informal conferences, the Commission provided Judge Thomas with the factual information it had and gave him the opportunity to present other information bearing on the investigation. Formal charges were initiated and a hearing was held at which Judge Thomas appeared with counsel. He testified and offered evidence in his own behalf. Four of the original charges were dismissed and will not be considered by this Court in our review.

Judge Thomas contends that the position of the Commission is based on a flawed review and analysis of the applicable law and facts and that the Commission erred as a matter of law in failing to dismiss all counts. He argues that the conclusions of the Commission were based on speculation and innuendo and were contrary to the actual evidence and testimony. Judge Thomas claims that the case presented by the Commission did not reach the standard of clear and convincing evidence.

The following is a brief overview of the factual basis relating to each charge:

*Count I* alleges that Judge Thomas received ex parte communications from a defendant, Nick Hatfield, and his attorney in a pending misdemeanor criminal action. Following those communications, Judge Thomas entered an order suspending a nine-day jail sentence conditioned on the paying of child support by the defendant to his ex-wife, Carrie Hatfield. At that time Judge Thomas was having a personal relationship with the ex-wife. The order suspending sentence was entered without notice or involvement of the attorney for the Commonwealth.

*Count III* alleges that in January 2001, Judge Thomas asked, as a personal favor, a state trooper to be present when Carrie Hatfield retrieved her personal belongings from the residence of Jim Wilson, an ex-boyfriend with whom she was living, in order to move in with Judge Thomas.

*Count IV* alleges that in January 2001, Judge Thomas called Jim Wilson to complain of certain telephone calls which Wilson had been making. The count alleges that during this conversation, Judge Thomas threatened to inform law enforcement authorities that Wilson, who was the owner of a used-car dealership, was altering odometer readings.

*Count VI* alleges that Judge Thomas, during an informal appearance before the Commission, made a representation of material fact that he did not have a personal relationship with Carrie Hatfield until November 2000. Whereas, the Commission found that the personal relationship began at least as early as August 1998.

## I.

### Standard of Review

■ The standard of review on appeals from the Judicial Conduct Commission is set out in *Wilson v. Judicial Retirement and Removal Com'n*, Ky., 673 S.W.2d 426 (1984). That case recognized that the discipline of members of the judiciary was the responsibility of the Commission and as the finder of fact it may make reasonable conclusions based upon the facts. Review by the Supreme Court is available on appeal but this Court must accept the findings and conclusions of the Commission unless they are clearly erroneous; that is to say, unreasonable. *Wilson, supra: see also Long v. Judicial Retirement & Removal Com'n*, Ky., 610 S.W.2d 614 (1980).

## II.

### Count One: Ex parte Communications

We do not find that the Commission was clearly erroneous or unreasonable in reaching its conclusion, as based on the evidence in the record, that Judge Thomas had violated SCR 4.300, Canon 3, Kentucky Code of Judicial Conduct, when he engaged in ex parte communications with Nick Hatfield and his attorney. Judge Thomas spoke to the individuals, signed and executed an order prepared by Hatfield's attorney without first notifying the county attorney and permitting him either to approve or make objections to the order. The defense by Judge Thomas that his actions should be permitted because of a "long-standing judicial policy in Marshall County" which permits such ex parte communications is without merit.

Although there are certain limited exceptions to the rule against ex parte communications, the mere reference to a so-called "local policy" does not come within the enumerated exceptions outlined in Canon 3B(7)(a). It should be pointed out that the claim of a personal relationship with Carrie Hatfield is not crucial to the finding by the Commission that Judge Thomas violated the Code of Judicial Conduct in regard to ex parte communications.

## III.

### Count Three: Personal Favor

The Commission was not clearly erroneous in determining that Judge Thomas had asked a state trooper to do him a personal favor that advanced his personal interests in violation of SCR 4.300, Canon 2D. Judge Thomas had asked the state trooper to assist Carrie Hatfield in moving from her ex-boyfriend's home to the home of Judge Thomas. Judge Thomas does not deny the facts surrounding this count. He argues that there is a policy of the Kentucky State Police that allows ordinary citizens to request police escorts in situations where one spouse is moving out.

It should be recognized that there is no unfairness in holding Judge Thomas to a higher standard than an ordinary citizen. All judges are held to a higher standard by virtue of the Code of Judicial Conduct. The arguments by Judge Thomas to the contrary are totally without merit. There was no emergency protective order involved in this situation.

Judge Thomas has not offered any evidence to clearly establish a policy of the Kentucky State Police with respect to move-outs in domestic matters. A defense witness, a state trooper who did not partic-

ipate in this move-out, testified that the most common procedure for this type of situation is to get an emergency protective order from the appropriate court. The trooper also testified that had Carrie Hatfield, and not Judge Thomas, made the request, he would have required her to get some sort of paperwork. Judge Thomas also acknowledged that when a private individual comes to his court and explains that they want to get their belongings from an estranged spouse, he tells them that they must see a private attorney or the county attorney. This procedure was not followed in regard to Carrie Hatfield.

Thus, we agree with the Judicial Conduct Commission that Judge Thomas violated the Code of Judicial Conduct when he used his influence to obtain the assistance of the state trooper in the Hatfield move from the Wilson home into the home of Judge Thomas.

## IV.

### Count Four: Telephone Call by Judge Thomas

This count involves a telephone call from Judge Thomas to James Wilson, Hatfield's ex-boyfriend, during which Judge Thomas threatened to inform law enforcement authorities that Wilson, the owner of a used car dealership, was altering odometer readings. Judge Thomas admits that on January 22, 2001, he called Wilson and asked him, "how he would like it if the state police or FBI started looking into your rolling back odometers on cars." Judge Thomas denies that the telephone call was made to intimidate Wilson and that it did not constitute an ethical violation. We agree with the Commission that this defense is without merit. The findings and conclusions of the Commission on this count were not clearly erroneous.

## V.

### Count Six: Comments to Commission

This count alleges that Judge Thomas, during an informal appearance before the Commission misrepresented a material fact to the effect that he did not have a "personal relationship" with Hatfield until November 2000. The Commission believes that his personal relationship began at least as early as August 1998. Judge Thomas contends that he misunderstood the questions of the Commission and that there is no audio or video record to establish the actual language used in the context of his misstatements.

The record of this meeting was kept by the executive secretary of the Commission as minutes of all such meetings are compiled. The executive secretary testified that he kept such minutes and stated that the minutes reflect that Judge Thomas denied being with Carrie Hatfield or having any type of personal relationship prior to November 2000. At the hearing, Judge Thomas admitted making those statements to the Commission and that the minutes were accurate.

We must agree with the Commission that Judge Thomas misled the Commission regarding his relationship with Hatfield. Thus, he violated Canons 1 and 2A of the Kentucky Code of Judicial Conduct because he failed to observe the high standards of conduct that preserve the integrity and independence of the judiciary, and he failed to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Subsequent disclosures by Judge Thomas do not exonerate him from this violation.

## VI.

### Past Conduct

It was not error for the Commission to take judicial notice of its own prior

rulings regarding disciplinary action it took against Judge Thomas. Here, the prior sanctions imposed on Judge Thomas were relevant in considering the new charges. Within a year of the current charges, Judge Thomas had been sanctioned for committing violations of the same disciplinary rules, Canons 2B and 3B(7). The fact that these prior sanctions did not deter him from committing further violations was an important consideration in determining the appropriate punishment for the current misbehavior.

■ Judge Thomas has failed to demonstrate in any way that he was unduly prejudiced by the failure of the Commission to formally introduce the prior offenses into evidence at the hearing. In order to find reversible error in an administrative decision, a reviewing court must determine that the error was prejudicial. *See* 2 Am.Jur.2d *Administrative Law* § 622 (2001), *citing Witmer v. United States,* 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

Upon a consideration of the totality of the circumstances, the charges filed against him, and the responses made by Judge Thomas, we find the Order of the Judicial Conduct Commission suspending Judge Thomas for 180 days is reasonable and proper. There is no reason to modify the Order of Suspension.

The decision of the Judicial Conduct Commission is affirmed.

LAMBERT, C.J., COOPER and JOHNSTONE, JJ., concur.

KELLER, J., dissents by separate opinion and is joined by GRAVES and STUMBO, JJ.

GRAVES, J., also dissents by separate opinion.

KELLER, Justice, dissenting.

I respectfully dissent from the majority opinion because I believe the Judicial Conduct Commission's ("the Commission's") findings as to Count III are clearly erroneous. I can find no support for the Commission's conclusion that Judge Thomas violated the Kentucky Code of Judicial Conduct by asking Kentucky State Trooper Meadows to accompany Carrie Hatfield and help ensure her safety as she moved out of Jim Wilson's home. Accordingly, I would vacate the Commission's conclusions of law as to Count III and, because the Commission's disciplinary sanction depends, at least in part, upon its conclusions as to Count III, I would remand this matter to the Commission for it to reevaluate an appropriate disciplinary sanction for Judge Thomas's other violations.

The Commission determined that Judge Thomas's request violated the Code because "[a] judge must avoid lending the prestige of judicial office to advance the judge's private interest or the interest of others" and concluded that, by doing so, Judge Thomas violated three (3) separate Canons:

Judge Thomas' [sic] action in asking Trooper Meadows to do a personal favor constituted misconduct in office in violation of SCR 4.020(1)(b)(i) and violated Canon 1 by failing to observe high standards of conduct necessary to preserve the integrity and independence of the judiciary, Canon 2A by failing to respect and comply with the law and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary and Canon 2D by lending the prestige of his office to advance his private interests and those of Ms. Hatfield.

All of the Commission's legal conclusions regarding Count III, however, stem from its belief that, by asking Trooper Meadows to accompany Ms. Hatfield, Judge Thomas

sought and received preferential treatment because of his position in the judiciary. Because there is no evidence to support that belief, the Commission's ultimate conclusions are clearly erroneous.

With ample concern, I observe that today's majority opinion states that "Judge Thomas has not offered any evidence to clearly establish a policy of the Kentucky State Police with respect to move-outs in domestic matters."[1] This statement gives me pause not only because the record is brimming with evidence of such a policy, but also because it appears that the majority believes Judge Thomas bears the responsibility of proving that the "favor" Trooper Meadows extended him by taking steps to ensure the protection of Ms. Hatfield was unrelated to Judge Thomas's position in the judiciary—in other words, the burden to prove that he *did not* engage in unethical conduct by seeking preferential treatment. Of course, Judge Thomas shoulders no such burden, and, in fact, the Commission may sanction Judge Thomas for the conduct alleged in Count III only if it finds *by clear and convincing evidence*[2] that Judge Thomas abused his judicial office in connection with his request of Trooper Meadows. In other words, "[t]he evidence *to sustain the charges* must be clear and convincing,"[3] not the evidence that Judge Thomas offered in defense. Even under the deferential standard of review cited in the majority opinion, the Commission's findings as to Count III are unreasonable.

First, there is absolutely no testimony anywhere in the record to support the inference that Trooper Meadows's decision to accompany Ms. Hatfield as she moved out of Mr. Wilson's home was influenced in any way by the fact that a district court judge made the request. The Commission's conclusion rests exclusively on innuendo to the effect that Trooper Meadows extended a favor to Judge Thomas that he would not have extended to other members of the community. As *all* of the testimony in the record—and, particularly, the sworn testimony of two (2) Kentucky State Troopers—directly contradicts this innuendo, the Commission's unfounded suspicions cannot possibly constitute clear and convincing evidence of an ethical violation.

Second, in contrast to the majority opinion's interpretation, I believe the testimony at the hearing clearly and unequivocally showed that Judge Thomas's request was neither out-of-the-ordinary nor granted solely because of Judge Thomas's position. Trooper Meadows himself testified that, in the over twelve (12) years he had worked for Kentucky State Police, he had both: (1) himself accompanied domestic violence victims in "move-out" situations without a court order directing him to do so; and (2) knew that other officers had done the same. Trooper Meadows further testified that Ms. Hatfield could have made the same request that Judge Thomas did,[4] and

1. Majority Opinion, 77 S.W.3d 578, 580 (2002).

2. SCR 4.160; *Nicholson v. Judicial Retirement and Removal Commission*, Ky., 573 S.W.2d 642, 644 (1978).

3. *Wilson v. Judicial Retirement and Removal Commission*, Ky., 673 S.W.2d 426, 427 (1984) (emphasis added).

4. The majority opinion erroneously paraphrases this portion of Trooper Meadows's testimony when it states, "The trooper also testified that had Carrie Hatfield, and not Judge Thomas, made the request, he *would have required* her to get some sort of paperwork." Majority Opinion, *supra* at 581 (emphasis added). In fact, Trooper Meadows testified "I *may* have *requested* that Carrie get some paperwork...." (emphasis added). Later, Trooper Meadows clarified that such pa-

that Judge Thomas's position as judge was thus inconsequential to the request. Trooper Scott Lathram unequivocally verified Trooper Meadows's account of the policy:

Q: If a person calls us, whether it's a woman or a man, and says I'm moving out, I'm afraid that if my spouse finds out, they're going to beat the whatever out of me because they've done it before. And, I'm afraid for my safety. Can someone come out here and be here when I'm moving out . . .

A: Yes, sir, we do that on occasion.

Q: Now, do those types of calls come into the KSP post?

A: Fairly regularly—I apologize, I don't have the statistics here to give you any type of frequency on those. But, in my ten years as an officer I've done it several times.

Q: Would there be instances where rather than contacting KSP post they may actually call contact at [sic] state trooper and ask if they would be able to be present when they move out?

A: Yes, sir, that's happened to me personally.

Q: Where someone asked you to be present?

A: Yes, sir—and, we get several calls. I guess that's one of the things that I show pride in. There's a good sense of trust when your neighbor and people that you know, call you at home to report something, or inquire about something, or to ask for some type of service whether it's extra patrol or anything like that. I take pride in that.

. . .

Q: If a person, let's assume Carrie Hatfield—have there been instances where the person who has been beaten doesn't call, but a person who is a family member or friend will call up and say my friend is going to move out and she's afraid she will be beat up, can someone go out there. Does that happen?

A: Yes, sir—yes, sir, a third party call.

Q: A third party calls up and or the person them self calls up and says either me or my friend has been [the] subject of physical abuse by the person I'm living with and I'm going to move out. Can a person be there when I move out so that my personal safety will be secure.

A: Yes, sir—is that a reasonable request, is that what you're asking?

Q: Yes.

A: Yes.

Q: Is that a reasonable request with your understanding of the policy at post?

A: Yes.

. . .

Q: So, if you're at the courthouse and a stranger came up and says, officer I may have some problems with a move out I'm doing today will you come and keep watch while its going on, there's been violence—the person has been violent in the past. You may very well do that for the stranger?

A: Yes.

Q: So, if a friend comes up to you and says, I may have some violence happening, you may do that for the

---

perwork would only be relevant if he were asked to sort out personal property disputes, but that his presence at the Wilson home in

this matter related only to Hatfield's personal safety and "that has nothing to do with a court order."

friend just like you would for the stranger?

A: And, I'm on duty.

Q: And, you['re] on duty—so, if a Judge comes up and says will you do this, you're going to treat him just the same as the stranger?

A: Yes, sir, I feel it's my job as a Kentucky State Trooper to protect the citizens of the Commonwealth. And, whoever makes the request, that really, I think in my job as in yours, Your Honor, we have to be unbiased. And, if somebody makes a request and it's within the scope of the law, I feel it's my duty to go and help. . . .

. . .

Q: So, the Judge in that case, I know you're not real familiar with the situation, but he would be treated just the same as the stranger asking you?

A: Yes, Your Honor, I sure would. I guess I don't look at people, I look at the request. The only time that I wouldn't do that is if it was an immediate family member or if I was doing business with that certain individual.

Q: And, you have been asked to do that before by a stranger and you have done it?

A: Yes, sir. I've had them come up to me at a restaurant—yes, sir.

Judge Thomas himself testified that he understood the policy to be as described by Troopers Meadows and Lathram:

Q: At the time you made that request, did you believe that this was a request that only a district judge could make of a trooper to accommodate a person when they're moving out of a house in a domestic violence issue situation?

A: If I understand your question correctly, no. No, I didn't—I thought anybody could ask.

Q: You heard the testimony of Trooper Lathram regarding KSP's policy of—of going out in these types of circumstances. Was that your understanding of what the situation was at the time that you made that request of Trooper Meadows?

A: Yes, sir; and, as a matter of fact, I've had domestic violence hearings and fourth degree assault hearings where in those hearings testimony has been elicited that in fact the state police or the sheriffs department has done just that.

Q: And when you say just that—going out without having a—someone actually having filed an EPO?

A: Or an order from any court.

Upon cross-examination by the Commission's counsel, Judge Thomas directly confronted the inference that he used his judicial office as capital when he requested that Trooper Meadows accompany Ms. Hatfield:

Q: And, I take it you were satisfied that he [Trooper Meadows] would respond since you were the district judge and accommodate your request?

A: I did not in any way attempt to use my judicial authority or the fact that I was the judge in asking the request. I was not in my robe. I asked him as he was walking to the courthouse. And, as I have stated to the Commission before, and firmly acknowledged it before—I said, Barry, will you do me a personal favor.

Third, the record clearly establishes that Judge Thomas's request was justified by legitimate concerns for Ms. Hatfield's safe-

ty. Ms. Hatfield testified that: (1) she concealed from Mr. Wilson the fact that she was moving out of his home because she believed he may become violent as he had on four (4) or five (5) previous occasions; and (2) that she did not take steps to obtain an Emergency Protective Order (EPO) because Mr. Wilson had told her that he had well-placed friends in the criminal justice system who would take care of him. During his testimony, Mr. Wilson, who is approximately a foot (1') taller and one hundred pounds (100#) heavier than Ms. Hatfield, admitted that he had been physically abusive towards her in the past on more than one occasion. Finally, Trooper Meadows testified that, in his opinion, his presence during Ms. Hatfield's move was prudent because he believed the situation could easily have escalated if he had not been there.

In short, there is simply no evidence to support the Commission's conclusion that Judge Thomas sought and/or obtained preferential treatment when he asked Trooper Meadows to accompany Ms. Hatfield to Mr. Wilson's home in the hope of deterring violent behavior on Mr. Wilson's part. As such, there is no basis for the Commission's conclusion that, by making this request of Trooper Meadows, Judge Thomas undermined the independence or integrity of the judiciary or used his judicial office to advance private interests—even if we endorse the dubious proposition that preventing domestic violence is a "private" interest. While Judge Thomas's conduct under the other counts may have violated the ethical canons, the efforts he took to guarantee Ms. Hatfield's safety did not. Accordingly, I would vacate the Commission's finding of guilt as to Count III and remand this matter to the Commission for it to reevaluate an appropriate disciplinary sanction for the other counts.

GRAVES and STUMBO, JJ., join this dissenting opinion.

GRAVES, Justice, dissenting.

I dissent from the finding that Judge Thomas misrepresented his relationship with Ms. Hatfield. Initially, Judge Thomas answered questions concerning a "close personal relationship." Thereafter, the Commission charged him with omitting information about a "personal relationship." I believe it to be fundamentally unfair and a violation of due process for the Commission not only to investigate, to prosecute, and to adjudicate, but also to legislate by defining the elements of an offense. The unfairness is compounded by changing an element of the offense from "close personal relationship" to "personal relationship."

The Judicial Conduct Commission was created by the judicial article and in many ways, it functions as a specialized court. Consequently, I believe that members of the Commission should abide by Canon (3)(E)(1) of the Code of Judicial Conduct which requires disqualification in a proceeding where there is personal knowledge of disputed evidentiary facts. In finding Judge Thomas guilty by omitting facts it expected to hear, the Commission created the facts which it has adjudicated to be the basis of the offense it legislated.

A review of the procedural events and Judge Thomas' communications with the Commission establish that Judge Thomas provided accurate information. Moreover, Judge Thomas responded to the questions which were put to him although, as time progressed, the Commission re-phrased the "relationship" question which the Commission initially asked Judge Thomas, from "close personal relationship" to "personal relationship" in the later charge. Judge Thomas interpreted "close personal relationship" to be romantic or boyfriend/girlfriend.

On April 7, 2001, Judge Thomas received a letter from the Commission invit-

ing him to appear at an informal conference before the Commission scheduled for April 26, 2001, to discuss whether he had a "close personal relationship" with Ms. Hatfield during most of his term as District Judge. The April 26, 2001, informal conference is when the Commission alleges that Judge Thomas made misrepresentations about the nature and extent of his relationship with Ms. Hatfield. Judge Thomas testified at the informal appearance before the Commission that he did not believe that he had a "close personal relationship" with Ms. Hatfield during most of his term as a District Judge. Even though it is a subjective call by each individual, the phrases "close personal relationship" and "personal relationship" are different terms of endearment.

Notwithstanding the Commission's own use of the phrase "close personal relationship" at the time of the informal conference, when the Commission later returned a charge against Judge Thomas, the phrase became "personal relationship." It is elementary that there is a difference between a "personal relationship" and a "close personal relationship."

The Commission's use of different phrases at different critical times for the alleged relationship reflects the fundamentally ambiguous nature of the question asked of Judge Thomas. Under a long line of case law, the answer to a question or line of questioning which is considered fundamentally ambiguous is insufficient as a matter of law to support a contention that the person answering the question has made a materially false statement of facts, such as would support a perjury claim. *United States v. Lighte,* 782 F.2d 367, 375 (2nd Cir.1986); *United States v. Finucan,* 708 F.2d 838, 848 (1st Cir.1983); *United States v. Bell,* 623 F.2d 1132, 1137 (5th Cir.1980); *United States v. Tonelli,* 577 F.2d 194, 199 (3d Cir.1978); *United States*

*v. Wall,* 371 F.2d 398, 400 (6th Cir.1967). Stated another way, when there is more than one way of interpreting or understanding a question, and the witness has answered truthfully as to his understanding of the question then, there is, as a matter of law, no materially false statement of fact. Further, the general rule is that an alleged materially false statement must be a statement of fact, not a mere statement of opinion or belief. 60A Am. Jur.2d *Perjury,* § 22, 1080 (1988). According to St. Augustine, lying is "having one thing in one's heart and uttering another with the intention to deceive." Sissela Bok, *Lying: Moral Choice in Public and Private Life* 33 (Vintage Books 1989).

Changing the "close personal relationship" allegation into the "personal relationship" charge did not provide either "fair warning" or "explicit standards" to Judge Thomas concerning the area of inquiry.

I would dismiss Count VI and remand to the Commission to review the period of suspension.