RENDERED: OCTOBER 20, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0171-RR

JULIA H. GORDON                                                APPELLANT

V.                          IN SUPREME COURT

JUDICIAL CONDUCT COMMISSION                          APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

## AFFIRMING

The Judicial Conduct Commission (Commission) determined that Julia Hawes Gordon, Family Court Judge for the 6th Judicial Circuit in Daviess County, Kentucky, committed judicial misconduct as charged in five of the six counts against her and ordered that she be removed from office. Judge Gordon appeals from the Commission's Final Order, raising multiple claims of error. Finding no error warranting reversal of the Commission's Final Order, we affirm.

## FACTS AND PROCEDURAL HISTORY

Judge Gordon was elected as a Family Court Judge in 2016 and took her oath of office on January 3, 2017. During the alleged misconduct, Judge Gordon served as the only Family Court Judge in Daviess County and her dockets included Juvenile Dependency, Neglect and Abuse (DNA), Civil

Dissolution, Child Custody and Support, Termination of Parental Rights and Adoption, and Domestic Violence.[1]

Prior to her election in 2016, Judge Gordon was an attorney and served as a Guardian Ad Litem (GAL) in Daviess County. She served as GAL for a child named Dalton since he was a young child, approximately a decade. After years of Dalton being moved around the state with no permanent home or family, Judge Gordon resigned as his GAL and she and her husband Sale adopted him in 2013, just after he turned eighteen. Dalton suffers from substance abuse and mental illness issues. He also has criminal history dating back to 2017.

Throughout 2021 and 2022, the Commission received a series of complaints alleging Judge Gordon engaged in numerous instances of judicial misconduct. Between 2017 and 2021, Judge Gordon inappropriately inserted herself into at least three of her son's Daviess County criminal cases.[2] Judge Gordon was the complaining witness or victim in each of those cases, placing her in the difficult position of concurrently being a parent, victim and judge in the same county in which Dalton's criminal cases were adjudicated. Given the nature of the accusations, the Commission authorized a preliminary

---

[1] During the alleged misconduct and throughout all Commission proceedings, Daviess County had only one family court. Judge Gordon served as the judge for Family Court, Division 3. On April 8, 2022, a new family court division was created in Daviess County, Division 4, by the enactment of House Bill 214. Judge Gordon filed to run in that race and faces two other candidates on the November 2022 ballot for the Division 4 seat.

[2] The Daviess County criminal case numbers are 17-F-00748, 20-M-00492, and 20-F-01038.

2

investigation pursuant to Kentucky Supreme Court Rule (SCR) 4.170(1). The Commission notified Judge Gordon of the allegations on July 6, 2021, and she responded with a twenty-seven page sworn statement. Judge Gordon also participated in an informal conference with the Commission. SCR 4.170(2).

After considering the evidence obtained from the preliminary investigation and Judge Gordon's statement, the Commission served Judge Gordon with Notice of Formal Proceedings on October 21, 2021, outlining six charges against her alleging violations of the Code of Judicial Conduct. In her twenty-two page response, containing over one hundred pages of supporting documentation, Judge Gordon conceded some of the allegations. After the initiation of formal proceedings, Judge Gordon and the Commission agreed to a temporary suspension, effective December 3, 2021, pending the outcome of the formal hearing.

The formal hearing commenced on April 4, 2022, and lasted three days. The Commission heard testimony from eleven witnesses and reviewed over forty-five exhibits. Judge Gordon testified at the hearing. After the hearing, the Commission rendered its Findings of Fact, Conclusions of Law, and Final Order on April 22, 2022. The Commission found, by clear and convincing evidence, Judge Gordon guilty of violating the Code of Judicial Conduct and engaging in misconduct as outlined in Counts I through V. The charges in Count VI were not established by clear and convincing evidence.

Some of the issues presented to the Commission, but not all, arose because Judge Gordon's son, Dalton, faced several criminal matters over the

last several years. The Commission concluded that the misconduct alleged against Judge Gordon involved her repeatedly acting well outside the constitutional role of judge, creating conflicts and bias by acting as counsel, advisor, and advocate for her son in his criminal cases, and then lobbying and pushing both the prosecutor and judge presiding over those cases to take actions as she directed. As stated in the Final Order, the Commission's decision ultimately turned on proof of Judge Gordon's:

> [(1)] extensive and repeated pattern and practice, over her tenure on the Family Court Bench, of exercising improper influence for her own benefit and the benefit of her son in his numerous criminal matters; [(2)] extremely poor judgment and taking profoundly unwise actions that were also outside the scope and beyond the boundaries of proper judicial activity; [(3)] tampering with or destroying actual or potential evidence in criminal matters involving her son; [(4)] having dozens if not hundreds of recorded telephone calls with her son while he was in custody in the Daviess County Jail planning, establishing and confirming much of her misconduct;[3] [(5)] creating conflicts of interest because of the legal representation of her son in his criminal matters by an attorney regularly appearing before her in Family Court matters, which representation she failed to disclose to participants in court proceedings before her and for which she failed to recuse, creating actual bias or at least the perception of bias and the lack of impartiality; [(6)] sending and receiving hundreds of *ex parte* communications via (1) hundreds of text messages with the county attorney and counsel representing her son, both of whom regularly appeared before her in other matters, and (2) via text messages, personal meetings, and/or phone calls with the judges, the prosecutor and the defense attorney handling her son's criminal cases through which she was attempting to represent and advocate for her son; [(7)] retaliating against the Cabinet for Health and Family Services (the Cabinet) and its workers who advocated

---

[3] The Commission stated that the recorded jail calls are damning in a variety of respects for Judge Gordon. The Commission heard only a few of the hundreds of calls during the hearing but enough were played to prove the allegations. Judge Gordon testified and argued that she did not think anyone would ever hear or listen to the calls, implying she otherwise would not have said the things she said if she knew anyone would hear them.

4

actions contrary to her views in JDNA matters; [(8)] exhibiting a lack of candor to the Judicial Ethics Committee (JEC) from which she obtained advisory opinions (based on limited or incorrect facts she presented) and using those advisory opinions to justify her actions and in defense of the Charges; and [(9)] exhibiting a lack of candor to the Commission.

(Internal footnotes omitted.) Ultimately, the Commission found that the claims against Judge Gordon presented significant concerns and indicated a pattern of improper conduct and violations of the Code of Judicial Conduct. As a result of her misconduct, and because of the egregious nature of her abuses of judicial power and flagrant violation of the public trust, the Commission removed Judge Gordon from office. Judge Gordon filed a motion to reconsider, requesting that the Commission make new findings which "take into consideration Marsy's Law and Judge Gordon's rights thereunder."[4] The Commission denied Judge Gordon's motion.

In its Final Order, the Commission detailed each of the six charges.

**COUNT I**

On March 5, 2020, Judge Gordon spoke to Dalton while he was incarcerated at the Daviess County Detention Center and told him she worked out a plan for his pending criminal case, 20-M-00492. She told Dalton if he did not leave it up to her, "They will come up with it on their own." Judge Gordon also told Dalton if he did not leave it up to her, there would be no contact with the victim (Judge Gordon) and he would not be allowed to go to

---

[4] Kentucky constitutional amendment § 26A, also known as Marsy's Law, gives victims of crime procedural protections throughout the criminal justice process.

5

the home of the victim (Judge Gordon's home). According to the presiding judge, Judge Burlew, and as reflected in his comments on the record, Judge Gordon spoke with him for forty-five minutes about her recommendations for Dalton's release on bond. She told Dalton she sent a text message to the presiding judge about his docket time and her hope to work out a time to pick Dalton up from the Detention Center.[5] Judge Gordon also told Dalton she had talked to Daviess County Attorney Claud Porter about getting Dalton into a treatment program.

Judge Gordon contacted the county attorney to influence his position on Dalton's bond status and the resolution of Dalton's criminal charges. Through these communications, Judge Gordon influenced various bond motions and *ex parte* orders in Dalton's cases. After Dalton was arrested and charged in 20-F-01038, she told Dalton that the county attorney was trying to take the case out of her hands. On October 1, 2020, Judge Gordon told Dalton that she did not think Dalton's charges in 20-F-01038 met the necessary requirements for a felony, even though she was the complaining witness in the incident. Judge Gordon also told Dalton she would schedule an in-person meeting with his

---

[5] In Judge Gordon's sworn response letter, she initially denied having "*ex parte* communications with Judge Burlew to affect the outcome of [her] son's cases." She later gave some substantiation to this charge in her Response to Notice of Formal Proceedings and Charges on November 22, 2021 (admitting she texted with Judge Burlew "regarding scheduling"). The record at the hearing established that Judge Gordon had much more than *ex parte* contact with Judge Burlew, and the video of the hearing and Judge Burlew's statements on the record during Dalton's case make painfully clear that Judge Gordon was not candid and truthful with the Commission. Judge Gordon, at a minimum, lacked candor in her communication with the Commission.

6

attorney, Clay Wilkey.  During a phone call on November 8, 2020, Judge Gordon told Dalton she sent the county attorney and Wilkey a proposal for the resolution of Dalton's criminal charges but found out that the county attorney had already sent Wilkey a plea offer.  On the same phone call, Judge Gordon stated she told the county attorney she wanted to make the decisions for her family and her house.  These actions were not limited to Dalton's incarceration in 2020.

Additionally, on more than one occasion Judge Gordon took actions to destroy evidence and obstruct justice.  She attempted to alter, conceal, or tamper with Dalton's social media accounts and cellphone content to protect him from criminal liability.  After Dalton was arrested on felony charges in 2017, Judge Gordon told him she cleaned up content on his phone, and she had to "severely edit" the pictures on his Instagram account.  She told Dalton that he was not successful in deleting everything from his Facebook page before law enforcement obtained his phone.  Judge Gordon asked Dalton for his password and assured him she would delete certain content.

Judge Gordon took numerous actions to exert her influence as Family Court Judge to obstruct justice and affect the outcome of her son's criminal proceedings.  Based upon the totality of evidence presented at the Hearing, and following significant deliberation by the Commission, by a vote of 6-0, the Commission found that Judge Gordon's actions violated SCR 4.020(1)(b)(i) and

7

constituted misconduct in office.[6] Furthermore, Judge Gordon's actions violated SCR 4.300 and the relevant portions of the following Canons of the Code of Judicial Conduct:

> Canon 1, Rule 1.1 which requires a judge to comply with the law, including the Code of Judicial Conduct.
>
> Canon 1, Rule 1.2 which requires a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.
>
> Canon 1, Rule 1.3 which requires a judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.
>
> Canon 2, Rule 2.1 which requires that the duties of judicial office shall take precedence over all of a judge's personal and extrajudicial activities.
>
> Canon 2, Rule 2.2 which requires that a judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.
>
> Canon 2, Rule 2.4(B) which requires that a judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.
>
> Canon 3, Rule 3.1(C) which provides that when engaging in extrajudicial activities, a judge shall not participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality.
>
> Canon 3, Rule 3.1(D) which provides that when engaging in extrajudicial activities, a judge shall not engage in conduct that would appear to a reasonable person to be coercive.

---

[6] SCR 4.020(1)(b)(i) states that the Commission shall have authority "[t]o impose the sanctions, separately or collectively of (1) admonition, private reprimand or public reprimand; (2) suspension without pay, or removal or retirement from judicial office, upon any judge of the Court of Justice or lawyer while a candidate for judicial office, who after notice and hearing the Commission finds guilty of any one or more of the following: (i) Misconduct in office."

## COUNT II

Judge Gordon threatened to impose monetary fines upon Cabinet supervisors and case workers for late reports and other course of employment events. On August 1, 2017, she entered an order fining Cabinet workers fifteen dollars for failure to file reports and stated those funds would be paid as a credit for mouth swab drug tests from Necco, a foster child placement agency. She then attempted to enforce those fines on multiple Cabinet supervisors. On December 16, 2019, she sent an email to Cabinet employees threatening fines if they missed court report deadlines. She used her position of power and ordered juvenile placements inconsistent with Cabinet recommendations. Only after the Cabinet appealed some of these orders, did she set them aside, thus avoiding reversal.[7]

When Judge Gordon took the bench as Family Court Judge on January 3, 2017, GAL representation was assigned by Daviess County court clerks, who kept a rotating list of eligible attorneys. She subsequently took control of GAL assignments for her JDNA docket, including the appointments of attorney Wilkey, who represented her son in criminal matters, and Andrew Johnson, who worked at her husband's law firm, thereby creating a conflict and the perception of favoritism.[8]

---

[7] Judge Gordon admitted some of her actions relative to this charge. She stated she used an incorrect contempt process on Cabinet employees when she became a judge.

[8] Judge Gordon notes that a recent amendment to the Kentucky Family Court Rule of Procedure and Practice (FCRPP) 36 makes it clear that judges, or their designated clerk, shall appoint GALs. That amendment was effective February 1,

Judge Gordon removed or threatened to remove attorneys from her GAL list for arbitrary reasons. This included removal of an attorney because she was not "supportive of addicts" and/or acted as an obstructionist by failing to waive Judge Gordon's conflicts.

Judge Gordon used her influence as Family Court Judge to obtain favorable treatment from Daviess County Jailer Art Maglinger. While Judge Gordon served as Family Court Judge and Dalton was incarcerated, she approached Maglinger and used her position of influence to arrange semi-private meetings in the jailer's office with Dalton while he was incarcerated during non-visiting hours at the detention center. The detention center explicitly prohibits bringing in food and drinks on visits with inmates, yet Judge Gordon frequently brought Dalton meals, drinks, magazines, and books on her accommodated visits. She routinely used her position to allow Dalton to enjoy privileges that other inmates were not permitted to receive.[9]

Count II alleged that Judge Gordon abused her power and overstepped the authority of her position and engaged in acts which brought her impartiality into question. By a vote of 6-0, the Commission found that Judge Gordon's actions violated SCR 4.020(1)(b)(i) and constituted misconduct in office. Furthermore, her actions violated SCR 4.300 and the relevant portions of the following Canons of the Code of Judicial Conduct:

---

2020. It is unclear when exactly Judge Gordon began personally handling the GAL appointments.

[9] Judge Gordon stated that Dalton has been incarcerated several times since these semi-private visits and she no longer visits him through Maglinger.

10

Canon 1, Rule 1.1, *supra.*

Canon 1, Rule 1.2, *supra.*

Canon 2, Rule 2.1, *supra.*

Canon 2, Rule 2.2, *supra.*

Canon 2, Rule 2.3(A), which requires that a judge perform the duties of judicial office, including administrative duties, without bias or prejudice.

Canon 2, Rule 2.3(B), which requires that a judge shall not, in the performance of judicial duties, by words or conduct, manifest bias or prejudice, or engage in harassment and shall not permit court staff, court officials, or others subject to the judge's discretion or control.

Canon 2, Rule 2.4(B), *supra.*

## COUNT III

Judge Gordon took it upon herself to administer drug tests using her secretary, her case manager, and others to conduct such testing, creating conflict and calling her impartiality into question. The validity of the drug testing was questionable as urine tests were stored in chambers in a refrigerator Judge Gordon purchased and on occasion the samples left the courthouse with Judge Gordon's staff overnight, compromising the chain of custody.[10]

---

[10] Judge Gordon stated that she asked for the administration of drug tests because she thought it was in the best interests of the children and families and that her intent was to improve the administration of justice. She explained that if the Cabinet required a parent or family member to take a drug test before they were permitted to care for a child, and accepted drug testing facilities were closed, she would decide for her staff to administer the test. She stated that she no longer engages in this practice.

Count III alleged that Judge Gordon mismanaged her courtroom and deviated from acceptable standards of judicial conduct. By a vote of 6-0, the Commission found that Judge Gordon's actions violated SCR 4.020(1)(b)(i) and constituted misconduct in office. Furthermore, her actions violated SCR 4.300 and the relevant portions of the following Canons of the Code of Judicial Conduct:

Canon 1, Rule 1.1, *supra.*

Canon 1, Rule 1.2, *supra.*

Canon 2, Rule 2.2, *supra.*

Canon 2, Rule 2.3(A), *supra.*

Canon 2, Rule 2.3(B), *supra.*

Canon 2, Rule 2.4(B), *supra.*

Canon 2, Rule 2.8(B), which requires that a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's discretion and control.

Canon 2, Rule 2.12(A), which provides that a judge shall require court staff, court officials, and others subject to the judge's discretion and control to act in a manner consistent with the judge's obligations under the Code of Judicial Conduct.

## **COUNT IV**

Count IV pertains to Judge Gordon's lack of candor toward the Commission. In her July 21, 2021 response to the Commission, Judge Gordon stated, "I have NO authority to hire or fire attorneys for my adult son. My son did hire Clay Wilkey to represent him." However, on March 9, 2018, she told

12

Dalton she paid thousands of dollars for him to have the best attorney represent him in order to minimize the damage and buy him "another shot." Then on March 11, 2018, Dalton expressed to Judge Gordon his dissatisfaction that Judge Gordon was terminating Wilkey's representation. Judge Gordon responded she was not terminating his services, just that she was not paying him. She later told Dalton she could not stop paying Wilkey with a felony hanging over Dalton's head.

Judge Gordon also told the Commission that she did not get involved with Dalton's criminal cases, but she engaged in repeated acts to influence and resolve them, including meeting with the presiding judge on March 6, 2020, to discuss Dalton's bond conditions. In her July 21, 2021 response to the Commission, she stated she never requested that charges be dropped against Dalton and she could not recall a single time she had ever requested Dalton not go to jail.

Count IV alleged that during the Commission's investigation into her practices as Family Court Judge, Judge Gordon demonstrated a lack of candor and misrepresented material facts to the Commission and the Judicial Ethics Committee. By a vote of 6-0, the Commission found that Judge Gordon's actions violated SCR 4.020(1)(b)(i) and constituted misconduct in office. Furthermore, her actions violated SCR 4.300 and the relevant portions of the following Canons of the Code of Judicial Conduct:

Canon 1, Rule 1.1, *supra.*

Canon 1, Rule 1.2, *supra.*

Canon 2, Rule 2.16(A), which requires that a judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies.

## COUNT V

Count V pertains to various conflicts of interest. Judge Gordon failed to avoid a conflict of interest in her role as Family Court Judge in regard to Dalton's criminal cases by retaining, paying, and directing the actions of Dalton's attorney, Wilkey, who actively practices law in her courtroom and regularly receives GAL appointments.[11] On March 9, 2018, Judge Gordon told Dalton that she paid thousands of dollars for Dalton to have the best attorney represent him in order to minimize the damage and buy Dalton "another shot." Two days later, Dalton expressed to Judge Gordon his dissatisfaction that Judge Gordon was terminating Wilkey's representation.[12] On March 6, 2021, a

---

[11] Judge Gordon sought guidance from the Judicial Ethics Committee regarding Wilkey appearing in her court. That opinion, dated July 18, 2018, stated that if Judge Gordon believed she could be impartial and fair, she could continue to sit on Wilkey's cases provided a five-step process was satisfied:

1. You must first decide that you can be fair and impartial.
2. You must hold a hearing and hear the arguments of the attorneys.
3. You must enter a finding on the record regarding your decision. The authority for your decision is the case of *Stopher v. Commonwealth,* 57 S.W.3d 787 (Ky. 2001).
4. If you believe you can be fair and impartial, the attorneys may either accept your decision or attempt to swear you off the bench with an appeal to the Chief Justice.
5. Your decision to go ahead and sit will then be subject to further appeal down the line.

Prior to that opinion, Wilkey obtained an opinion from the Kentucky Bar Association's Ethics "Hotline" Committee that stated he could represent Dalton and still appear in Judge Gordon's court.

[12] Dalton stated he had to tell Wilkey that Judge Gordon was terminating his services. Judge Gordon replied, "I'm not terminating his services, I'm just not paying

court-appointed Daviess County Public Defender was replaced by Wilkey as counsel for Dalton after the public defender expressed to the presiding judge the notion that a special prosecutor and a special judge would be appropriate in Dalton's case, 20-M-00492. On July 22, 2021, Dalton told Judge Gordon that Wilkey was not his lawyer, because Judge Gordon was the one who hired him. Judge Gordon misrepresented to the Judicial Ethics Committee (JEC) that she had not retained Wilkey as Dalton's attorney and was not paying Wilkey's legal fees.[13]

Judge Gordon had a conflict of interest when she presided over cases in which attorney Pat Flaherty represented a party after she hired Pat's brother, Brian Flaherty, as a staff attorney. She later recused herself from presiding over all of Pat Flaherty's cases, but fearing that individuals were forum shopping and avoiding her courtroom by seeking the representation of Pat Flaherty, she issued a General Order on August 28, 2019, stating she could preside over cases in which Pat Flaherty represented a party, and that the party represented by counsel opposing Flaherty could request a transfer due to the conflict on a case-by-case basis. Despite the General Order, Judge Gordon failed to disclose this conflict on the record and failed to recuse or seek waivers of the conflict.

---

for them anymore." She explained, "I'm just making it clear you were his client all along. We are just paying the bills."

[13] Judge Gordon stated she exaggerated to Dalton about the legal fees in the heat of the moment. Her husband paid the fees, but, as a practical matter, that meant the entire family suffered that expenditure. Her statement to the Commission that she did not pay was true, and her statement to Dalton was less precise.

15

Judge Gordon was not candid with the JEC in seeking opinions regarding possible conflicts. In addition, Judge Gordon failed to avoid conflicts of interest in her assignment of GALs. She misrepresented to the JEC that Daviess County bench clerks were randomly assigning GALs to cases. She took control of GAL assignments for her JDNA docket, showing favoritism to attorneys Wilkey and Andrew Johnson, who works at her husband's law firm. Awarding GAL assignments to Wilkey and Johnson constitutes a conflict of interest.[14]

Count V alleged that Judge Gordon failed to recognize and avoid conflicts of interest which brought her impartiality into question. By a vote of 6-0, the Commission found that Judge Gordon's actions violated SCR 4.020(1)(b)(i) and constituted misconduct in office. Furthermore, her actions violated SCR 4.300 and the relevant portions of the following Canons of the Code of Judicial Conduct:

Canon 1, Rule 1.1, *supra.*

Canon 1, Rule 1.2, *supra.*

Canon 2 Rule 2.1, *supra.*

---

[14] Wilkey told the Commission that he never felt as if he got preferential treatment from Judge Gordon in court. Judge Gordon argues there are no glaring disparities that demonstrate that she showed favoritism in her appointments. Thomas Vallandingham, a local attorney that appeared before Judge Gordon, told investigator Weaver there are other reasons to explain disparities in GAL appointments, such as GALs having varying availability, or the desire to appoint the same GAL in related cases, i.e., in cases involving more than one child from the same family. Additionally, Judge Gordon notes that Wilkey and Johnson were longtime practitioners on the GAL docket from before Judge Gordon took the bench; they were assigned many "trailer cases" in which a litigant has appeared in a related case that spins off another proceeding.

16

Canon 2, Rule 2.2, *supra.*

Canon 2, Rule 2.3(A), *supra.*

Canon 2, Rule 2.4(B), *supra.*

Canon 2, Rule 2.11(A), which provides a judge must disqualify herself in any proceeding in which her impartiality might reasonably be questioned.

## COUNT VI

Count VI alleged that Judge Gordon discussed the details of confidential cases with Dalton and ignored Dalton's bond conditions, allowing him to remain at Judge Gordon's residence despite explicit knowledge that he was violating bond conditions. The Commission determined, by a vote of 6-0, that this Charge was not established by clear and convincing evidence.

## ANALYSIS

In her appeal, Judge Gordon raises several arguments regarding the applicability of Marsy's Law, admissibility and sufficiency of the evidence, and whether removal was warranted. In proceedings before the Commission, charges must be proven by clear and convincing evidence. SCR 4.160. On appeal, we "must accept the findings and conclusions of the [C]ommission unless they are clearly erroneous; that is to say, unreasonable." *Wilson v. Judicial Ret. & Removal Comm'n*, 673 S.W.2d 426, 427-28 (Ky. 1984) (citing *Long v. Judicial Ret. & Removal Comm'n*, 610 S.W.2d 614 (Ky. 1980)). SCR 4.290(5) states that this Court "shall have power to affirm, modify or set aside in whole or in part the order of the Commission, or to remand the action to the

17

Commission for further proceedings." We address each of Judge Gordon's arguments in turn.

## I. Marsy's Law Does Not Create a Different Standard of Conduct for a Sitting Judge.

In reaching its decision to remove Judge Gordon, the Commission relied on Judge Gordon's involvement in Dalton's criminal proceedings and stated that she used her influence, contacts and position of authority to direct and impact the outcome of his criminal proceedings. Judge Gordon argues that she was not using her influence to control the outcome but was instead exercising her lawful rights as a victim under Kentucky constitutional amendment § 26A, also known as Marsy's Law, to consult with the Daviess County Attorney about the status of Dalton's criminal cases. Section 26A gives victims of crime procedural protections throughout the criminal justice process. Among other things, the law gives crime victims the right to be notified of court proceedings, the right to speak at proceedings where a plea or sentencing may occur, and the right to have their safety considered when rulings are made. *Id.*

At the time Judge Gordon exercised influence and involvement in her son's criminal proceedings, Marsy's Law was not yet in effect. Kentuckians did not vote to ratify the Marsy's Law amendment until November 3, 2020. Judge Gordon's overt and inappropriate involvement in her son's criminal cases occurred at various times between October 2017 and November 2020—before the amendment took effect. The General Assembly did not indicate any intent that the Marsy's Law amendment apply retroactively, nor could it, given the

18

impossibility of a law's ability to provide procedural protections for victims in criminal proceedings which have already concluded.

Nevertheless, Judge Gordon's actions were still impermissible under the law. One of the most egregious violations occurred when she privately spoke with Judge Burlew, the presiding judge in one of her son's criminal matters, and additionally she did so without the knowledge of either the prosecutor or her son's defense attorney. In Judge Gordon's response to the Commission's charges, she admitted that she texted Judge Burlew regarding scheduling and "[w]ith regard to her input on bond restrictions." Judge Burlew informed Dalton, in open court on March 6, 2020, that he "was with [Judge Gordon] for at least 45 minutes this morning" to get a "heads up" on Dalton, his history, and struggles prior to his appearance in court.

Judge Gordon cites Kentucky Revised Statute (KRS) 421.500(6), the statutory enactment prior to the constitutional amendment in § 26A, which states that "[t]he victim shall be consulted by the attorney for the Commonwealth on the disposition of the case, including dismissal, release of the defendant pending judicial proceedings, any conditions of release, a negotiated plea, and entry into a pretrial diversion program." Judge Gordon notes that a prior version of the crime victims' statute, enacted in 2013, included a broader definition of victim. That statute gave victims the right to notice of judicial proceedings relating to their case, the victims a right to make an impact statement during sentencing, and ensured victims knew how to register to be notified when a person is released from prison if the case involves

19

a violent crime. Clearly Marsy's Law and its statutory predecessor, KRS 421.500, significantly expanded the rights of victims in criminal proceedings against their accused by adding the right to be treated with fairness and due consideration in court proceedings and the right to reasonable protection from the accused. Ky. Const. § 26A. It allows victims to consult with the attorney for the Commonwealth or designees, receive notification in advance of any pardon or commutation of a sentence, and the right to be present and heard throughout the proceedings. *Id.*

Although Judge Gordon argues that she was permitted to participate in the proceedings, she completely overlooks the fact that her *ex parte* communications were wholly inappropriate and, as a member of the judiciary, she should have known they were inappropriate. SCR 4.020, Canon 2, Rule 2.9(A). While Marsy's Law gives victims the ability to speak at pleas and sentencing, it certainly does not give victims a direct line for *ex parte* communications with the presiding judge.

Marsy's Law aims to give victims a "meaningful role throughout the criminal and juvenile justice systems," Ky. Const. § 26A, but it does not allow the victim to control the proceedings or arrange plans for a resolution. Over the course of four years, Judge Gordon exchanged hundreds of text messages with Claud Porter, the Daviess County Attorney. She circumvented the county attorney and her son's own counsel by submitting her own plea proposal to

counsel.[15]  She also questioned whether the county attorney was trying to "take the case out of [her] hands" in a September 9, 2020 jail phone call with Dalton. On one occasion, she told Dalton's defense counsel that she planned to cancel court to personally drive her son's bond order to Larue County to obtain the signature of the special judge assigned to her son's case. She behaved brazenly and this behavior was undoubtedly intertwined with her authority and influence as a judge.

Even if Judge Gordon only intended to participate as a victim, her failure to appreciate the power of her position and the public perception of her actions was reckless. In taking on the burden and privilege of judicial office, members of the judiciary must at all times be sensitive to the impact of their actions. While members of the judiciary are not required to forego all rights and opportunities, "it is understood that one must accept some burdens in order to enjoy the other benefits of being a judge." *In re Maze*, 85 S.W.3d 599, 602 (Ky. 2002).

We note that, even assuming Judge Gordon was entitled to the privileges and protections of Marsy's Law throughout her son's prosecutions, those privileges and protections do not trump her duties and responsibilities as a judge. As explained in a judicial misconduct case in 2002, "It should be recognized that there is no unfairness in holding Judge Thomas to a higher standard than an ordinary citizen. All judges are held to a higher standard by

---

[15] This plan was referenced in Judge Gordon's March 5, 2020 jail telephone call with Dalton.

virtue of the Code of Judicial Conduct." *Thomas v. Judicial Conduct Comm'n*, 77 S.W.3d 578, 580 (Ky. 2002). Likewise, it is fair to hold Judge Gordon to a higher standard. She was still required to act in a manner consistent with the Code of Judicial Conduct, which she failed to do.

## II.    The Commission's Findings for Each Charge Were Supported by Clear and Convincing Evidence.

Judge Gordon makes several arguments pertaining to the adequacy of the evidence supporting the Commission's findings. In *Commonwealth, Cabinet for Health & Family Services v. T.N.H.*, 302 S.W.3d 658, 663 (Ky. 2010), we stated that "[c]lear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." (Internal quotations and citations omitted.) In a previous judicial misconduct case, we explained that:

> Even under this heightened burden of proof, we still adhere to a clearly erroneous standard of review. [Kentucky Rule of Civil Procedure] CR 52.01. As a result, we as an appellate court are obligated to give a great deal of deference to the Commission's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them.

*Gentry v. Judicial Conduct Comm'n*, 612 S.W.3d 832, 846 (Ky. 2020) (citing *T.N.H.*, 302 S.W.3d at 663). Judge Gordon argues that the specific findings with regards to Counts I-V were not supported by clear and convincing evidence. We address the evidence supporting each charge in turn.

22

**A. Count I – Judge Gordon Exerted Influence in Dalton's Cases and Deleted Evidence from His Phone and Social Media Accounts.**

Judge Gordon argues that the Commission failed to demonstrate that she destroyed evidence by deleting items from her son's phone and social media accounts. At the hearing, counsel for the Commission introduced Judge Gordon's written response to the charges wherein she admits that she "deleted embarrassing and inappropriate material from Dalton's social media accounts, primarily so his younger siblings would not see it, as he had used his siblings' phones." Counsel for the Commission also introduced a recorded phone call between Judge Gordon and her son on January 21, 2018, where she informed him that she cleaned up the content on his phone and had to "severely edit" the pictures on his Instagram account. She told Dalton:

> I went in to clean up—like, I wanted to clean up one thing, like your photos or something, and I noticed a screenshot on Instagram or somewhere. So then I—I was like, this isn't good. They're going to—all that Instagram, and had to do some severe editing of all things on Instagram.

Regardless of her rationale for doing so, Judge Gordon deleted material from her son's social media accounts after he had been arrested and taken into custody. In a prior jail call between Judge Gordon and Dalton on October 26, 2017, Dalton stated he tried to "delete everything" before the police got his phone. Judge Gordon told him he was unsuccessful, and Dalton told her to delete his Facebook account and gave her his password to allow her to do so.

These recorded and written statements admitting to destruction of evidence satisfied the clear and convincing evidence standard before the Commission. *Gentry*, 612 S.W.3d at 846.

23

## B. Count II – Judge Gordon Mismanaged GAL Appointments and Solicited Special Treatment from the Local Jailer.

Judge Gordon argues that none of the findings in Count II were supported by clear and convincing evidence. Count II alleged that Judge Gordon (1) displayed favoritism in the appointment of GALs; (2) threatened removal of attorneys from her GAL list for arbitrary reasons; (3) used her influence as a Family Court Judge to obtain favorable treatment from Daviess County Jailer Art Maglinger; and (4) threatened to impose monetary fines upon Cabinet supervisors and case workers for late reports and other events in the course of employment.

Prior to 2017, Daviess County GAL representation was assigned by Daviess County court clerks, who maintained a rotating list of eligible attorneys. Once Judge Gordon took the bench, she took control of GAL assignments for her JDNA docket. To substantiate the allegations of favoritism stemming from Judge Gordon's mismanagement of the GAL panel, counsel for the Commission introduced a spreadsheet maintained by the Administrative Office of the Courts (AOC) which indicated that certain attorneys were appointed more frequently than others. Among the attorneys with the highest number of assignments were Clay Wilkey, Dalton's defense attorney, and Andrew Johnson, who worked at Judge Gordon's husband's law firm.

Judge Gordon recognized that a potential conflict could arise from both Wilkey's representation of her son and Johnson's practice with her husband and admitted that she likely should have done more to ensure such potential conflicts were avoided. Canon 1, Rule 1.2 requires a judge to "act at all times

24

in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary" and to "avoid impropriety and the appearance of impropriety." Based on the AOC report, it appears Judge Gordon failed to appreciate and avoid the overt perception of favoritism.[16]

Count II also states that Judge Gordon removed or threatened to remove attorneys from her GAL list for arbitrary reasons. Attorney Janelle Farley testified before the Commission that for months in late 2017 and early 2018, she noticed a decrease in her GAL appointments in Judge Gordon's court. When Farley met with Judge Gordon to inquire about this issue, Judge Gordon told her she removed her from the GAL list because Farley was not "forgiving enough" of addicts. Farley noted that, as of the date of the hearing, she had worked as a GAL in numerous other courts and counties since 2008 and was never made aware of any issues with her representation. She felt that Judge Gordon removed her from her GAL list because of her personal views. On cross-examination, Judge Gordon's counsel referenced an exhibit showing the number of GAL appointments by attorney from 2017 through 2021 and Farley received more appointments than any other attorney. However, Judge Gordon's counsel was unsure whether the data represented only Daviess County appointments or all counties.

---

[16] Judge Gordon notes that the AOC report was deficient because it did not account for parent or warning order appointments and that several attorneys listed were never GALs in Judge Gordon's court and therefore should not have been included in the report. These alleged deficiencies were described by Judge Gordon during the hearing and the Commission had the opportunity to consider her arguments in reaching its decision regarding Count II.

Judge Gordon also argues that the evidence pertaining to the remaining allegations in Count II was insufficient. The Commission alleged that Judge Gordon abused her position as judge to gain special access to her son while he was incarcerated at the Daviess County Jail. Daviess County Jailer Maglinger testified at the hearing that Judge Gordon contacted him and requested special visitation privileges with Dalton. Maglinger allowed Judge Gordon to meet with Dalton "just a handful of times" in his office while Maglinger remained present. On occasion Judge Gordon would bring Dalton food and drinks and these visits occurred outside normal visiting hours. According to Maglinger, this visitation privilege was not afforded to other inmates or their visitors. The Commission also introduced jail telephone recordings of conversations between Judge Gordon and Dalton during which they discussed the items she would try to bring into the jail for him.

When questioned by Judge Gordon's counsel, Maglinger thought it was best for Judge Gordon to meet with Dalton in a closed setting because of her position as a judge. Judge Gordon explained in her hearing testimony that she and Maglinger agreed upon the semi-private visits because of safety concerns associated with Dalton's incarceration with people whose cases had been handled by his mother, a judge.

Finally, Count II states that Judge Gordon acted abusively toward court officials from the Cabinet by threatening to impose fines upon case workers failing to timely file reports. Judge Gordon argues that this charge was not proven by clear and convincing evidence, but also states that she "has since

26

admitted that [imposition of fines] was a mistake made early on in her career." Judge Gordon admitted to this conduct, making this argument moot.

It appears that the parties did not fully understand, or could not completely explain, the makeup of the data representing the GAL appointments from 2017 through 2021. As such, and based on the counter-arguments Judge Gordon makes, we do not find that the Commission proved, by clear and convincing evidence, that Judge Gordon displayed favoritism in assigning GALs. However, all other evidence pertaining to Count II constitutes clear and convincing evidence. This evidence supports the Commission's findings that Judge Gordon violated the Code of Judicial Conduct. CR 52.01 states that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Here, the Commission was best suited to examine the evidence and assess credibility of the witnesses in reaching its conclusions.

### C. Count III – Judge Gordon Improperly Directed Her Staff to Administer Drug Tests.

In Count III, the Commission alleged that Judge Gordon frequently mismanaged her courtroom and deviated from acceptable standards of judicial conduct. According to the Commission, Judge Gordon inappropriately and arbitrarily administered drug tests in the courthouse by requiring her secretary, case managers, and others to conduct the testing and store the samples in a refrigerator in her chambers. Judge Gordon argues that the findings in Count III are not supported by clear and convincing evidence.

At the hearing, counsel for the Commission introduced an email from the regional director of the Cabinet's Department of Community Based Services

that detailed a temporary removal hearing before Judge Gordon. The Cabinet stated that Dr. Nadar completed a drug screen on a client that was negative. During a three-way call with Judge Gordon, the Cabinet worker, and her case manager, Judge Gordon explained that she would never accept a drug screen from Dr. Nadar, as that is what he is paid to do. The regional director stated in the email that she assumed Judge Gordon meant Dr. Nadar would alter results. When asked where to send the client, Judge Gordon replied that the client could come to court or gave a few alternative options. The client agreed to go to court and was tested twice. Both times the results were inconclusive, so Judge Gordon instructed her case manager to take the drug test home and "watch it." The results came back negative. Judge Gordon directed that her staff should take home the collected samples overnight.

Not only was this testing procedure improper, but it also directly compromised the chain of custody. At the hearing, Judge Gordon admitted that she had her court staff administer drug tests.[17] She argues that no evidence was presented of a single drug testing order that was imposed arbitrarily, baselessly, or improperly. The vast majority of the drug testing orders were requested by the Cabinet, and none were challenged by appeals or

---

[17] Judge Gordon provided an example of when she might have had her staff administer drug tests. She described a situation in which a child is being removed from her mother's care and could be placed with her grandmother. However, the mother accused the grandmother of using drugs, so the Cabinet would not allow the grandmother to care for the child until the grandmother was drug tested. Judge Gordon said if it was after a certain time and the facilities offering drug tests were closed, she had her staff administer a drug test to prevent the child from being uprooted and placed temporarily with strangers.

28

motions to alter, amend or vacate. Judge Gordon admits that the procedural errors she made during her first few months on the bench were immediately remedied once such errors were brought to her attention.

The Commission's evidence, combined with Judge Gordon's testimony regarding these instances, constitutes clear and convincing evidence to support the Commission's findings regarding Count III.

### D. Counts IV and V – Judge Gordon Lacked Candor with the Commission and Failed to Avoid Conflicts of Interest.

In Count IV, the Commission alleged that Judge Gordon lacked candor with the Commission throughout its investigation and misrepresented material facts. Specifically, in her July 21, 2021 response to the Commission, Judge Gordon states she had no authority to hire or fire attorneys for Dalton and added that Dalton hired Wilkey to represent him. In seeking a JEC opinion regarding whether Wilkey could continue practicing before her in 2018, Judge Gordon informed the JEC that Dalton retained Wilkey and only her husband paid the legal fees. However, a mere three months before receiving the JEC opinion, Judge Gordon told Dalton that she paid thousands of dollars for him to have the best attorney represent him and minimize the damage. On March 11, 2018, Dalton expressed to Judge Gordon his dissatisfaction that Judge Gordon was terminating Wilkey's representation. Judge Gordon responded that she was not terminating his services, just that she was not paying him. Additionally, she told the Commission she did not get involved in Dalton's criminal cases, but she engaged in repeated acts to influence and resolve those cases, including meeting with Judge Burlew about Dalton's bond conditions.

The Commission introduced numerous exhibits demonstrating these discrepancies and Judge Gordon's lack of candor. The Commission introduced Judge Gordon's July 21 response and twelve recorded jail telephone calls between Judge Gordon and her son, during which she directly contradicted her representations to the Commission.

Count V also involves Wilkey's participation as Dalton's attorney. Count V alleged that Judge Gordon frequently failed to recognize and avoid conflicts of interest which brought her impartiality into question. The Commission alleged that Judge Gordon repeatedly failed to avoid conflicts of interest with respect to Wilkey. At the hearing, counsel for the Commission introduced significant evidence to demonstrate Judge Gordon's relationship with Wilkey, including hundreds of text messages they exchanged. In October 2020, Judge Gordon sought Wilkey's advice as to whether Kentucky State Police could access evidence from her son's cell phone or drop her son's pending criminal charges. After the conversation, Wilkey requested that Judge Gordon "please delete these messages." Wilkey regularly practiced in front of Judge Gordon and they had a level of familiarity that clearly presented a conflict in her position as a judge.

Additionally, when Judge Gordon presided over cases in which Wilkey was involved she did not always disclose to opposing counsel the conflict of interest presented by Wilkey's representation of her son. During the hearing the Commission's counsel asked Judge Gordon about Wilkey's GAL cases in her court and whether she disclosed that Wilkey represented her son in

30

criminal proceedings, or asked parties if they believed recusal was necessary. Judge Gordon stated she did not, because she did not believe she needed to disclose that information based on an Order entered by Chief Justice Minton regarding her recusal in one specific case in which Wilkey represented a party in her court. When questioned by counsel, she admitted that the Order was case-specific, not general, and could not say whether it accounted for Wilkey's continuing representation of Dalton in the future. In her brief, Judge Gordon admitted that she recognized a potential conflict of interest could arise from her relationships with various other attorneys, including Johnson, a partner at her husband's law firm, or Pat Flaherty, the brother of her staff attorney.

The Commission's evidence regarding Judge Gordon's lack of candor, and Judge Gordon's own recognition of the potential conflict and further admission that "she likely should have done more to ensure such potential conflicts were avoided," are sufficient to satisfy the clear and convincing evidence standard for Counts IV and V.

### III. The Introduction of the Video Recording of Dalton's Hearing before Judge Burlew Did Not Constitute Palpable Error.

Judge Gordon argues that the Commission's ultimate decision to remove her from office turns on the out-of-court statements made by an unavailable witness, Judge Burlew. The statements at issue were recorded in the court record during a hearing in Dalton's criminal case on March 6, 2020. The Commission noted that "the severity of the penalty imposed is driven significantly by [Judge Gordon's] violations of the Canons in Count I, and it alone justifies removal from office, even without the significant other

31

misconduct found through Counts II-V." Count I was based, in part, on a claim that Judge Gordon engaged in *ex parte* communications with presiding Judge Burlew to affect the outcome of Dalton's criminal case. In the video exhibit, Judge Burlew tells Dalton during a hearing that he spoke with Judge Gordon for at least forty-five minutes and got a "heads up" about Dalton, his history and struggles. Judge Gordon argues that this video was hearsay and should not have been admitted for the Commission's consideration.[18]

The video was included in the Commission's exhibit list and Judge Gordon did not object to the admission of the video during the hearing. At a bench conference in which the Commission sought to admit its exhibits, the Chair of the Commission asked Judge Gordon's counsel if he had any issues with the exhibits. He stated he did not anticipate having any objections. After counsel for the Commission finished reading its list of exhibits, the Chair of the Commission again asked Judge Gordon's counsel if there were any issues to which Judge Gordon's counsel responded, "No comment, no objection." Since this issue is not preserved, it is subject to palpable error review.

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

---

[18] "At a hearing before the Commission only evidence admissible under the Kentucky Rules of Evidence (KRE) shall be received. The Chairperson shall rule on all evidentiary matters." SCR 4.240.

CR 61.02. A palpable error "must be easily perceptible, plain, obvious and readily noticeable." *Nami Res. Co. v. Asher Land and Mineral*, 554 S.W.3d 323, 338 (Ky. 2018) (quoting *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006)). "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte.*" *Id.* (quoting *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017)).[19]

In hearings before the Commission, the Kentucky Rules of Evidence apply. SCR 4.240. KRE 804 provides exceptions to the hearsay rule when a declarant is unavailable as a witness. However, there is no indication that Judge Burlew was unavailable, and it is unclear why the Commission did not call him as a witness to testify regarding the conversation he had with Judge Gordon.

In any event, the admission of the video did not rise to the level of palpable error. Pursuant to the Code of Judicial Conduct, Judge Burlew is tasked with preserving the principles of justice and the rule of law. SCR 4.300, Preamble. "[J]udges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system." *Id.* Judges shall not permit or consider *ex parte*

---

[19] We note that Judge Gordon did not address the preservation issue and did not request palpable error review of this issue. In the criminal context, this Court has denied palpable error review unless specifically requested and briefed by the appellant. "Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant." *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008), as modified on denial of reh'g (May 22, 2008). A general request for review of all errors is insufficient. *Id.*

communications made to the judge outside the presence of the parties or their lawyers concerning a pending matter. SCR 4.300, Rule 2.9(A).[20] Judge Burlew's statement clearly went against his interest, as judges are generally not permitted to engage in *ex parte* communications. Judge Burlew made the statement about his forty-five-minute conversation with Judge Gordon in open court and on the record. The truth in his assertion can be gleaned from the circumstances under which the statement was made.

Even if the video was improperly admitted, there are other allegations in Count I besides the alleged *ex parte* communication with Judge Burlew. Judge Gordon communicated with the Daviess County Attorney about the outcome of Dalton's cases and those text communications were admitted as evidence. Judge Gordon asked the county attorney to "please please please get things worked out today for Dalton to serve some time as a consequence." She also told the county attorney that "[w]e have to get this done quickly. . . . He's going to blow it and risk losing his ability to go back to FOS if we don't get something done." FOS stands for Friends of Sinners and is a residential substance abuse program in Daviess County. In a span of twelve hours on December 18, 2017, Judge Gordon and the county attorney exchanged eighty text messages about Dalton's case. Most of these messages involved Judge Gordon pushing for information and requesting certain outcomes. Ultimately, Judge Gordon

---

[20] Further, "[a] judge shall not convey or permit others to convey the impression that any person or organization is in a position to influence the judge." SCR 4.300, Rule 2.4.

concluded that she planned to drive to Larue County at 6:00 a.m. the next morning to ensure the special judge signed a detention order.[21]

Previously, in July 2017, Judge Gordon messaged the county attorney requesting that Dalton receive deferred prosecution and enter an agreement to get treatment, to which the county attorney responded, "Yes I think I can make that happen." The influence Judge Gordon exerted in her son's case is undeniable.[22] Additionally, Count I includes the claim that Judge Gordon removed evidence from Dalton's phone, as discussed in Part II above. Because the other allegations of misconduct in Count I were supported by clear and convincing evidence, manifest injustice did not result from admission of the hearing video containing Judge Burlew's statement into evidence. CR 61.02.

## IV.    The Commission's Statements Regarding Judge Gordon's Imprecision or Lack of Candor Are Not Improper.

Next Judge Gordon argues that the Commission wrongly attributes her imprecision in her initial response to a lack of candor. She highlights the Commission's findings in Count V: "Judge Gordon misrepresented to the Judicial Ethics Committee (JEC) that she had not retained Mr. Wilkey as Dalton's attorney and was not paying Mr. Wilkey's legal fees." She claims that the Commission never introduced evidence to contradict her testimony, or the

---

[21] The outcome or actions Judge Gordon requested are immaterial. We deem it of no consequence that she was requesting Dalton be detained in some way, required to attend treatment, etc., as opposed to requesting that he receive preferential treatment or be pardoned for his actions. The operative facts are that she directly inserted herself into Dalton's cases and attempted to influence the outcome.

[22] There are numerous other instances of Judge Gordon's inappropriate contact with the Daviess County Attorney, as discussed throughout this Opinion.

billing documentation provided by Wilkey, demonstrating that Judge Gordon's husband (Dalton's father) paid for Dalton's legal fees. However, the payment aspect is merely one part of the Commission's multi-part basis for determining that Judge Gordon violated the Code of Judicial Conduct in Count V. The Commission also pointed to Judge Gordon's acts in directing and influencing Wilkey's actions and presiding over Pat Flaherty's cases.[23] Taken as a whole, any purported misrepresentation to the JEC regarding who paid for Wilkey's legal services is miniscule.

Judge Gordon also takes issue with what she considers to be the Commission's attempt to skew Wilkey's testimony to "fit its narrative." She argues that the Commission inaccurately claims that Wilkey admitted under oath that he lied to the investigator for the Commission, Gene Weaver, at Judge Gordon's request. Wilkey testified that he heard about the Commission's allegations against Judge Gordon from another attorney who also told him that his name was mentioned in relation to the allegations. Wilkey asked to meet with Judge Gordon and he asked her to show him the charges she received from the Commission.[24] According to his testimony, Judge Gordon asked him

---

[23] Based on an October 2017 JEC opinion, Judge Gordon recused herself from all of Pat Flaherty's cases. She soon feared that parties were forum shopping by hiring Pat Flaherty to avoid her courtroom, so she issued a General Order on August 28, 2019, stating she could preside over cases in which Pat Flaherty represented a party but noted that the opposing party could request a transfer due to the conflict on a case-by-case basis. The Commission alleged that, despite implementing this General Order, Judge Gordon failed to disclose this conflict on the record and failed to recuse or seek waivers of the conflict.

[24] Wilkey could not recall whether the document he requested to see was the notice of allegations against Judge Gordon or the formal charges.

"not to tell anyone she had them." When investigator Weaver asked Wilkey if he had seen the allegations against Judge Gordon, Wilkey told him no. Wilkey later wrote a letter to the Commission's counsel on December 20, 2021, and disclosed his lack of candor.

We find nothing inaccurate about the Commission's statement. Wilkey stated that Judge Gordon asked him not to tell anyone "that she had them." That can only mean not to tell anyone she had charges against her. It was Wilkey's decision to lie to investigator Weaver and, although he later admitted his deception, it was not improper for the Commission to include these events and information, which appeared in a footnote, in its findings.

**V. Judge Gordon's Arguments Regarding the Commission's Alleged Inflammatory Comments Are Not Persuasive.**

Judge Gordon argues that throughout its Findings, the Commission makes highly irrelevant and inflammatory comments. Judge Gordon takes issue with the following comment: "It is also disturbing that Mr. Wilkey advised Judge Gordon to delete her texts about their conversations of a Kentucky State Police investigation involving Dalton's phone and issues of sex trafficking and child abuse." This statement appeared in a footnote in the Commission's Final Order. Judge Gordon argues that, aside from being inappropriate and unnecessary, this statement completely distorts the true context of the text message thread.

The following text message exchange occurred between Judge Gordon and Wilkey on October 5, 2020, and was introduced by the Commission during the hearing:

WILKEY:

So Daltons date on 10/9 has been moved to 10/23. Not sure how or why. Cannot get thru to clerks office.
Was able to touch base w Det Ammon this morning. They haven't made much progress on their investigation. He is waiting for Ecrimes to execute the warrant on the phone and the cloud server. He is working w Henderson county prosecutors and said its perhaps the most troubling investigation he's ever had based on journals

JUDGE GORDON:

There's something shady going on I'm afraid. I think they're trying to hold him until they hear back from KSP.
He does write awful things. I don't know what he wrote, but I've seen things in the past. But he's like those people obsessed with serial killer documentaries. It's not like those people are or want to be serial killers because they want to know everything about them (I guess.)
All I know is that he isn't part of any human trafficking, and he hasn't abused any children. Not that I would trust him alone with my younger kids anymore, but I used to, and he never gave any indication he would ever hurt them.
Can I drop the felony theft charges? Is that something I can ask?
So they are doing all of this based on crap he wrote while he was high on meth??
Maybe ask Claud about the date change. Someone had to have moved it. And can you meet with Dalton and explain all of this to him and have him back off on calling me. He calls me twice a day, and when I don't answer he calls and calls and calls and calls.

38

WILKEY:                    I think it's all based on the journals from what I can gather.  I am not sure how the date could be changed without him continuing to waive the days for his hearing.  I'll try to get in touch w Claud and will try to get out there this week.  The issue with visiting him as [sic] that I don't have anything new to report and I cannot imagine he does either.  I think you can ask to drop the charges but I'd hold off for now

JUDGE GORDON:              If he faces charges on this new stuff from KSP, I need to put as much distance there as possible.  To the extent of discussing finding a way to dissolve the adoption or having him change his name back[. . . .] I don't know what charges he would be facing, but is there any way to keep it from being front page news?

WILKEY:                    I don't have answers to these questions but I think if he is charged it'll be news worthy regardless of the relationship.  Let's not put the cart before the horse tho.  I'm not sure how likely it is they access the phone.  And please delete these messages

JUDGE GORDON:              Done.  And as a reminder, "his" phone is actually MY phone, on MY phone account.

WILKEY:                    You may want to speak with an attorney about what you can and cannot do in regards to that phone

Wilkey testified at the hearing and gave little explanation regarding his October 5, 2020 conversation with Judge Gordon, informing the Commission that it had access to the conversation in its entirety.  He stated that he asked Judge Gordon to delete their conversation out of an abundance of caution, which she did, but he did not delete the conversation from his phone.

39

In this instance Judge Gordon does not raise an easily identified appealable issue but rather generally attacks the Commission's statements as inflammatory and irrelevant. We disagree. These text messages clearly indicate that the Kentucky State Police were either in possession, or seeking possession, of a phone owned by Judge Gordon and used by Dalton. Judge Gordon was concerned about the contents of the phone and sought advice on the situation from Wilkey. Judge Gordon made the statements about Dalton not being involved in sex trafficking or child abuse. Any reference to this conversation was valid and relevant, and occurred as a consequence of the comments Judge Gordon herself made. Finally, Judge Gordon notes that the Commission seemingly questioned her status as a victim of Dalton's crimes. Judge Gordon's status as a victim and the applicability of Marsy's Law are addressed in Part I of this Opinion.

## VI. Judge Gordon's Misconduct Warranted Removal.

Judge Gordon argues that the Commission's decision to remove her from office is both disproportionate and inconsistent with its prior decisions, citing four previous Commission cases for purposes of comparison.

Section 121 of the Kentucky Constitution gives the Commission the authority to take action in instances of judicial misconduct or unfitness for office. The Commission can impose the following sanctions: (1) admonition, private reprimand or public reprimand; (2) suspension without pay, or removal or retirement from judicial office. SCR 4.020(1)(b). "[W]hether sanctions are appropriate, and the degree of any sanctions to be imposed, should be

40

determined 'on such factors as the seriousness of the transgression, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system.'" *Gormley v. Judicial Conduct Comm'n*, 332 S.W.3d 717, 727 n.24 (Ky. 2010) (internal quotation omitted).

Judge Gordon cites a case in which Judge Sam Potter, Jr. was suspended for thirty days for consuming alcohol to a degree that affected the performance of his judicial duties, making inappropriate statements to parties and attorneys in open court, failing to provide basic due process rights to criminal defendants, and engaging in *ex parte* communications with parties and attorneys who appeared before him. *In re: the Matter of Sam Potter, Jr., Dist. Ct. Judge*, Amended Agreed Order of Suspension, Dec. 7, 2015, pp. 1-2. Judge Gordon also references Judge Timothy Langford who received a sixty-day suspension for requesting the use of public equipment and local inmates to perform reconstruction work on the church he attended and awarding community service hours to those that performed the work. *In re the Matter of Timothy A. Langford, Circuit Court Judge*, Agreed Order of Suspension, Apr. 2, 2018, pp. 3-4. In a 2015 matter, Circuit Judge Steven D. Combs was suspended for 180 days for failing to recuse himself from a case in which he had a business relationship with a defendant, engaging in inappropriate interactions with elected officials and local media outlets, making inappropriate phone calls to the local police department and an attorney, and engaging in inappropriate political activity. *In re: the Matter of Steven D. Combs*, Agreed Order of Suspension, Oct. 1, 2015, pp. 3-5.

We are familiar with these instances of misconduct and none of them rise to the level of Judge Gordon's misconduct. Judge Gordon committed numerous acts over an extended period, exercising her influence as a Family Court Judge to obstruct justice and affect the outcome of her son's criminal cases. While the referenced cases also include multiple instances of misconduct, none of the misconduct rises to the level of the persistent misconduct present here.

Importantly, Judge Gordon was previously warned about her actions related to Dalton's cases. In 2018, the Commission privately admonished Judge Gordon for her inappropriate involvement in Dalton's criminal cases.[25] She also testified at the hearing that she was previously called in by Chief Judge Wethington who informed her that he had received complaints about her actions in her son's cases. Nonetheless, she continued to engage in this behavior for the next three years, forcing the Commission to intervene again in 2021. Judge Gordon's misconduct exceeds the misconduct committed in *Potter*, *Langford* and *Combs*, especially in light of the Commission's prior warning.

---

[25] The private admonition was issued in relation to Judge Gordon's interactions with Judge Lisa Jones, a Daviess County District Court Judge. While the Commission letter to Judge Gordon agreeing to a private admonition contains no details about the Commission's complaint or informal conference, the CourtNet history introduced by the Commission as an exhibit includes one of Dalton's prior criminal cases from 2017 that was initially before Judge Jones, until a special judge was appointed. During the hearing, counsel for the Commission questioned Judge Gordon about whether she had been told to stay out of Dalton's cases. She said "yes," but proceeded to provide ambivalent information, stating that she spoke with a judge about concerns regarding recusal, and that the conversation was not necessarily about Dalton's cases, but it was about Dalton.

Judge Gordon also distinguishes her misconduct from the Commission's case involving Circuit Judge Beth Maze. *Maze v. Judicial Conduct Comm'n*, 612 S.W.3d 793 (Ky. 2020). In 2017, Judge Maze learned her ex-husband was arrested on several criminal charges, including possession of a controlled substance. *Id.* at 796. Judge Maze intervened by attempting to order drug tests at hospitals in two nearby counties and self-reported her misconduct to the Commission. *Id.* at 797. She wrote "Commonwealth Att. & Bath Co. Attorney" on the signature line, and she did not submit either order to the circuit clerk for entry in the record. *Id.* at 797-98. Her disqualification was mandatory, and there was no necessity established for her intervention in her ex-husband's cases. *Id.* Judge Maze also engaged in *ex parte* communications with a Commission member. *Id.* at 799. This Court agreed with the Commission's imposition of a public reprimand because Judge Maze retired from office before the Commission's hearing, making suspension impractical. *Id.* at 811.

Judge Gordon distinguishes her misconduct from Judge Maze's misconduct because she did not issue any orders in her son's cases, and only contacted a local jailer to safely visit her son. Additionally, she was not criminally indicted for any of her actions. She also reiterates her justification for asserting influence in her son's cases by relying on Marsy's Law.

Judge Gordon's case shares similarities with Judge Maze's case because of the familial aspect. Judge Maze was confronted with what she believed to be a spur of the moment crisis and a situation that impacted not only her ex-

43

husband, but her family and herself. Likewise, Judge Gordon has often been confronted with difficult situations that directly impact not only her son but her and her family. These situations are often unplanned and unfold in unpredictable ways. Nevertheless, judges are responsible for exercising sound judgment even when confronted with difficult issues, especially issues that involve loved ones. "Our duty is to assure the people of Kentucky that judges will 'conduct themselves as judges.'" *Alred v. Judicial Conduct Comm'n*, 395 S.W.3d 417, 447 (Ky. 2012) (Venters, J., concurring). Ultimately, Judge Gordon made many decisions over a span of several years, some precipitous and some seemingly more carefully considered, that resulted in numerous and separate violations of the Code of Judicial Conduct.

"Typically, removal stems from a deliberate course of action or numerous examples of separate violations of the Code of Judicial Conduct." *Gentry*, 612 S.W.3d at 847. We find Judge Gordon's conduct to be more akin to those cases in which judges were disciplined for more deliberate and repeated violations, as summarized in *Maze*:

> *See, e.g., Alred,* 395 S.W.3d at 446 (upholding judge's removal from office following findings of official misconduct on eight charges (representing separate events)); *Starnes v. Judicial Ret. & Removal Comm'n*, 680 S.W.2d 922, 923 (Ky. 1984) (upholding judge's removal from office for chronic and pervasive absence from court and inattention to business of office, and for refusal to disqualify over cases involving close personal friends); *Wilson v. Jud. Ret. & Removal Comm'n*, 673 S.W.2d 426, 428 (Ky. 1984) (upholding judge's removal from office for course of conduct, intentionally and wrongfully misusing judicial power, to assist close friend, and separate count of dismissing case following *ex parte* meeting with defendant); *see also Kentucky Jud. Conduct Comm'n v. Woods*, 25 S.W.3d 470, 471 (Ky. 2000) (noting multiple instances of judicial

44

abuse which justified district judge's removal from office (although judge in question had not appealed the Commission's order removing him from office)).

612 S.W.3d at 810-11.

In 2020, this Court upheld the removal of Judge Gentry in another case involving numerous violations of the Code of Judicial Conduct. *Gentry*, 612 S.W.3d at 849. The Commission charged Gentry with twelve counts of misconduct, which included misconduct related to campaign activity, retaliation against staff, mismanagement of staff and office environment, making inappropriate sexual advances toward an attorney, and failing to be candid and honest with the Commission. *Id.* at 836-40. Upon review of the record and counsel's arguments, the Court determined that the Commission's findings were supported by clear and convincing evidence and rejected Gentry's procedural and constitutional arguments, including her argument that the penalty of removal was unreasonable and disproportionate to the Commission's findings. *Id.* at 846.

As recognized in *Gentry*, comparing the misconduct of different judges is inherently difficult. *Id.* at 848. But the severity of removal is warranted based on the pattern and extent of misconduct present in this case. Quoting from the Commission's final order, we note the multiple bases for its decision in this case:

> [Judge Gordon's] conduct has violated numerous Rules of the Judicial Canons, including the following:
>
> - Failing to comply with the law (Canon 1, Rule 1.1).

45

- Failing to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and avoiding impropriety and the appearance of impropriety (Canon 1, Rule 1.2), and not abuse the prestige of judicial office to advance the personal interests of the judge or others (Canon 1, Rule 1.3).

- Failing to give precedence of the judicial office over all of a judge's personal and extrajudicial activities (Canon 2, Rule 2.1).

- Failing to perform the duties of her judicial office fairly and impartially (Canon 2, Rule 2.2) and without bias or prejudice (Canon 2, Rule 2.3(A) and (B)).

- Allowing her social, political, financial or other interests or relationships to influence her judicial conduct or judgment (Canon 2, Rule 2.4(B)). Failing to be patient, dignified, and courteous to those with whom the judge deals in an official capacity, and permitting similar conduct of others subject to her direction and control (Canon 2, Rule 2.8(B)).

- Failing to disqualify herself in any proceeding where her impartiality might reasonably be questioned (Canon 2, Rule 2.11(A)).

- Failing to require her staff to act in a manner consistent with the judge's obligations under the Code of Judicial Conduct (Canon 2, Rule 2.12(A)).

- Failing to cooperate and be candid and honest with judicial disciplinary agencies (Canon 2, Rule 2.16(A)).

- Retaliating against a person known or suspected to have assisted or cooperated with an investigation of a judge (Canon 2, Rule 2.16(B)).

- Participat[ing] in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality (Canon 3, Rule 3.1(C)).

- Engaging in conduct that would appear to a reasonable person to be coercive (Canon 3, Rule 3.1(D)).

46

Judge Gordon's conduct violating the Canons was not isolated but was a pattern of repeated conduct over an extended period of time and over her entire tenure as a judge and in a variety of ways. Her conduct violating the Canons was extensive and frequent and provided personal benefits to her and her adult son. The conduct occurred inside and outside the courtroom, and in her official capacity. . . . Based on the totality of the evidence presented, including acts admitted by Judge Gordon and conduct she cannot deny she engaged in, and based upon a reasonable and reasoned application of the Rules, it is clear that Judge Gordon lacks fitness to continue on the Bench.

Based on Judge Gordon's numerous violations of the Code of Judicial Conduct, we hold that the sanction of removal was appropriate.

## CONCLUSION

Based on the foregoing, the Judicial Conduct Commission's Final Order is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

R. Kent Westberry
Bridget M. Bush
Hunter E. Rommelman
Landrum & Shouse LLP

COUNSEL FOR APPELLEE:

Jeffrey C. Mando
Olivia F. Amlung
Joseph K. Hill
Adams Law, PLLC